Dear Dr. Wilbanks:
This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following questions:
 1. Does the State Board of Education and the State Board of Career and Technology Education have a statutory obligation under 70 O.S. 2001, § 17-108.2[ 70-17-108.2], to transfer appropriated money every year, as prescribed by subsection A of this section, to the Teachers' Retirement System for the funding of the Contributions Credit?
 2. If the answer to the first question is yes, does the failure of the Legislature to provide a line item or limits bill directing the State Board to fund the Contributions Credit described in 70 O.S. 2001, § 17-108.2[70-17-108.2], from the sums appropriated, change the statutory obligation of the State Board to pay amount necessary to fund the credit, as prescribed in this section?
 I. BACKGROUND
Section 17-108.2 of Title 70 was enacted in 1997 to provide a credit for qualifying teachers employed by either a school district or a technology center school district. See 1997 Okla. Sess. Laws ch. 300, § 1. The credit is to be offset against the employee's annual contribution to the Teachers' Retirement System ("TRS"). Since enactment, the Legislature has appropriated funds for this credit through a line-item appropriation to the State Board of Education ("SBE"). Funds to the *Page 2 
State Board of Career and Technology Education ("Career Tech") are appropriated separately.[1] The TRS staff confirmed that for every year prior to FY 2011 the SBE has in turn forwarded approximately the prescribed appropriation on a monthly basis to the TRS. Senate Bill 1561, which was signed by the Governor on the 9th day of June, 2010, was a general appropriations bill for the expenses of various agencies. See
2010 Okla. Sess. Laws ch. 427. The bill contained no line items for any of the executive, legislative or judicial agencies. See id. It appropriated funds to the SBE for its obligations, but unlike previous years the appropriations bill was without any specific line item directives. See id.
Given that the total appropriation, as provided in Section 7 of the bill for the support of public school activities to the State Board of Education was $419,789,004, as compared to approximately $491 million for the same expenses the prior year, the SBE was faced with reducing its expenditures.[2] See 2010 Okla. Sess. Laws ch. 427(7). The Board approved a budget work plan on June 29, 2010, that was designed to cover, among other things, an expected increase in health insurance costs.[3]
The approximate $35 million needed to fund the Teachers' Retirement Contribution Credit ("Credit") was not included in the budget. Subsequently on July 27, 2010, the SBE revisited the issue of the Credit and determined not to amend its Budget.[4] Accordingly and as confirmed by TRS, SBE has not funded any of the monthly payments required to pay the Credit on behalf of eligible teachers since the beginning of the FY11 fiscal year. Career Tech asserted through key staff members that it either has paid or fully intends to pay the credit for its teachers with FY11 appropriated funds as it has every year since enactment.[5] *Page 3 
 II. THE STATE BOARD OF EDUCATION AND THE STATE BOARD OF CAREER AND TECHNOLOGY EDUCATION HAVE A STATUTORY OBLIGATION UNDER 70 O.S. 2001, § 17-108.2[70-17-108.2], TO TRANSFER APPROPRIATED MONEY EVERY YEAR AS PRESCRIBED BY SUBSECTION A OF THIS SECTION, TO THE TEACHERS' RETIREMENT SYSTEM FOR THE FUNDING OF THE CONTRIBUTIONS CREDIT.
Whether SBE and the Career Tech have an obligation under 70 O.S. 2001, § 17-108.2[70-17-108.2] to transfer appropriated money to the TRS to fund the Credit in the amount prescribed by subsection A, is a question of statutory interpretation. "The fundamental rule of statutory construction is to ascertain and, if possible, give effect to the intention and purpose of the Legislature as expressed in the statute." Jackson v.Indep. Sch. Dist. No. 16, 648 P.2d 26, 29 (Okla. 1982).
The intent of the Legislature, as expressed in 70 O.S. 2001, § 17-108.2[70-17-108.2], is that teachers, based upon the scale provided in subsection A, receive a credit from the State against the employee's portion of the TRS contribution every year. Subsection A provides that,
 [F]or each plan year thereafter, a teacher employed by any school district or employed by a technology center school district who qualifies for a minimum salary pursuant to the schedule . . . shall have credited against the employee contribution amount, as applicable to the amount of compensation required to be paid to the teacher as a minimum salary . . . an annual amount based upon qualifying years of service[.]
Id. (emphasis added). Much of the legislative intent is clear on the face of the statute. However, the legislative intent with regard to the obligations imposed upon the various entities is susceptible to interpretation. Although the subject statute lacks clarity with regard to those obligations, legislative intent "is ascertained from the whole act in the light of the general purpose and object." City of Midwest City v.Harris, 561 P.2d 1357, 1358 (Okla. 1977). Rather than a single phrase, the whole of this statute must be viewed in order to determine the intent of the Legislature. And further, it must be interpreted such that the construction is reasonable.
 It is unnecessary to apply rules of construction to discern Legislative intent if the will is clearly expressed. However, if an ambiguity exists, a statute will be given a reasonable construction-one that will avoid absurd consequences while preserving legislative intent.
Okla. Ass'n for Equitable Taxation v. City of Okla. City, 901 P.2d 800, 804
(Okla. 1995) (footnote omitted).
Subsection B provides, "[t]he state shall pick up and pay the annual amount prescribed by subsection A of this section, . . . to the Teachers'Retirement System." Id. (emphasis added). Much *Page 4 
emphasis has been placed on the single phrase "the state shall pick up and pay," as it might pertain to the relative obligations imposed by the statute. In light of the fact that the legislative appropriation did not provide a line item directing that money be sent to TRS, the SBE interpreted this phrase in the statute to mean that (despite the appropriation in SB 1561), the State Legislature, rather than the SBE had on that day an obligation to fund the credit and pay the TRS.[6] The Board, accordingly, voted to apply the appropriated monies elsewhere and to call on the Legislature to fund the credit.[7]
Subsection C provides:
 If an eligible teacher terminates service prior to June 30 of any applicable plan year, the amounts prescribed by subsection A of this section, and transferred to the Teachers' Retirement System from the State Board of Education and the State Board of Career and Technology Education shall be retained by the Teachers' Retirement System of Oklahoma and treated as an actuarial gain of the System.
Id. (emphasis added).
In the event of an overpayment to TRS in any plan year due to teachers terminating service prior to June 30, TRS is to retain the excess (appropriated estimated amount exceeds actual amount needed to fund credit for every qualifying teacher), and treat it as "actuarial gain of the system." Id. Within this subsection we find the only reference to the funding mechanism for the transfer of funds to TRS. The funds are required to be "transferred to the Teachers' Retirement System from the State Board of Education and the State Board of Career and Technology Education" as a matter of course. Id.
It should be noted that TRS is not an "appropriated agency." It receives no direct legislative appropriations.[8] Further, there is no mechanism in 70 O.S. 2001, § 17-108.2[70-17-108.2] for money to flow to TRS for this credit, except through the SBE and Career Tech. See id.
Neither is there provision in this statute for the credit to be funded by the school districts. In other words, it is only via the SBE and Career Tech that the State may statutorily "pick up and pay" the Credit. To interpret this statute as placing the obligation for payment of appropriated funds to TRS anywhere other than on SBE and Career Tech would produce an unsupportable and even absurd result. *Page 5 
 In the interpretation of statutes, courts do not limit their consideration to a single word or phrase in isolation to attempt to determine their meaning, but construe together the various provisions of relevant legislative enactments to ascertain and give effect to the legislature's intention and will, and attempt to avoid unnatural and absurd consequences. Words and phrases of a statute are to be understood and used not in an abstract sense, but with due regard for context and they must harmonize with other sections of the act to determine the purpose and intent of the legislature.
McNeill v. City of Tulsa, 953 P.2d 329, 332 (Okla. 1998).
We also view this subsection with its expression of legislative intent that any excess paid to TRS should be retained by TRS to strengthen the actuarial health of the system, as a recognition and affirmation of the legislative obligation to fully fund the TRS. Maintaining a stable and reliable teachers' retirement system is a fundamental part of the Legislature's obligation under the Constitution.[9]
The obligations of the school district are detailed in subsequent subsections. If an employing school district has contractually committed to making payments of the employee contribution payment to the TRS, and the member is eligible for the State Credit amount for the fiscal year, "using funds available to the district and not by effecting the employee contribution through a deduction from the member's gross salary, the district shall pay additional compensation to each of its eligible teachers in an amount equal to the amount prescribed by subsection A. . . ." 70 O.S. 2001, § 17-108.2[70-17-108.2](D). By contrast, those school districts that do not commit to paying the employee contribution are directed to reduce the amount of the payroll deduction from the member's salary for the employee contribution to TRS by the amount of the credit based upon years of service, as prescribed in subsection A. See id. § 17-108.2(I). In either event, whether received as additional income or as a reduction in the payroll deduction, the benefit to the teacher is reported by the school district and is subject to any applicable federal and state taxes. Id. § 17-108.2(F), (I).
Oklahoma Attorney General Opinion 03-15 concerned a reduced legislative appropriation to the flexible benefit allowance for school district employees. There, the reduction in the allocation from SBE to the school districts did not operate to reduce the statutory obligation of the school district to *Page 6 
pay the required 75% of the cost of healthcare coverage less the allowance amount. Id. at 84. Similarly, a reduction in the appropriation to SBE merely reduces the available amount that SBE has to allocate among its programs and expenses. None of the obligations imposed by 70 O.S. 2001, § 17-108.2[70-17-108.2], whether imposed on SBE to allocate funds; on the school districts to administer the credit in their payroll systems or the TRS to credit the teacher's account, or on the individual teachers to pay taxes due are dependent upon the amount of funding SBE receives from the Legislature. There is no mechanism in this statute for any reduction or omission of payment.
Therefore, the answer to your first question is that the SBE and Career Tech have a statutory obligation to transfer appropriated money every year, as prescribed by 70 O.S. 2001, § 17-108.2[70-17-108.2], to the TRS for the funding of the Credit.
 III. THE STATE BOARD OF EDUCATION AND THE STATE BOARD OF CAREER AND TECHNOLOGY EDUCATION HAVE A STATUTORY OBLIGATION TO TRANSFER APPROPRIATED MONEY EVERY YEAR TO FUND THE CONTRIBUTIONS CREDIT FROM THE SUMS APPROPRIATED, REGARDLESS OF WHETHER THE LEGISLATURE PROVIDES A LINE ITEM OR LIMITS BILL DIRECTING SUCH ALLOCATION.
Essentially, you ask whether the fact that the Legislature failed to provide a specific or line item directive to fund the Credit in its appropriations bill, when it had done so in all previous years since enactment of the Contributions Credit statute, somehow changed or alleviated the statutory obligation of each entity to fund the Credit from the appropriated sums.
Clearly, although different in degree of specificity than in past years, appropriations were made to the SBE in each of Sections 1 through 10 and 139 of SB 1561. We understand that the appropriation made in Section 7, in the amount of $419,789,004.00 "for the support of public school activities" is the appropriation from which the TRS credit has historically been paid. Further, it was from this specific appropriated amount that the SBE determined, when making its allocations and budgeting among numerous programs and expenditures, to expend the bulk of the funds for other programs, including the Flexible Benefit Allowance, and to exclude the funding for the Teacher Retirement Credit.
The "appropriation of money" is setting it apart formally or officially for a special use or purpose, and where that is done by the Legislature in clear and unequivocal terms in a duly enacted law, it is an "appropriation." State ex rel. Bonsteel v. Allen, 91 So. 104, 106 (Fla. 1922). "No arbitrary form of expression or specified words are dictated or required by the Constitution in making an appropriation, and an appropriation may be made by implication when the language employed reasonably leads to the belief that such was the intention of the Legislature." Menefee v. Askew, 107 P. 159, 162(Okla. 1910). *Page 7 
After review of 70 O.S. 2001, § 17-108.2[70-17-108.2], we find no mention or inference of a requirement that the funds intended to flow from legislative appropriation to the SBE and then to TRS for funding the credit be specifically appropriated by the Legislature via a limits bill or line item. The subject appropriation of money to the SBE in SB 1561 was in all respects a valid appropriation.
 If there is any doubt as to the Legislature's power to act in any given situation, the doubt should be resolved in favor of the validity of the action taken by the Legislature. Restrictions and limitations upon legislative power are to be construed strictly, and are not to be extended to include matters not covered or implied by the language used.
Draper v. State, 621 P.2d 1142, 1146 (Okla. 1980)
Further, there is no indication or argument that the Legislature was obligated to provide a line item in order to validate the obligation of SBE to fund the credit, simply because it had done so in previous years. The Legislature did not line item a number of programs that SBE determined, in its discretion, to fund from the $419 million. Further, within SB 1561, the Legislature appropriated funds to numerous agencies and provided no line items. Finally, as indicated above, SBE did choose to fund numerous programs without the necessity of a line item from the Legislature.
We, therefore, find no justification within the text of the statute for the argument that the Legislature's decision not to provide a line item or limits bill, thereby presumably conferring discretion for allocation to the SBE, either nullified the obligation of the SBE or alternatively, and as asserted by SBE, equated to the failure of the Legislature to appropriate money for the funding of the credit.
We note that any interpretation or characterization of the Legislative decision to appropriate funds to SBE without providing a limits bill, as a failure on the part of the Legislature to fund the Credit, is without merit. Further, relying on such an interpretation of the statute in conjunction with the appropriations bill at least potentially creates the implication that the Legislature has acted, whether mindfully or not, to deprive the TRS of funds needed to fund the Credit, thereby diverting funds from the system. Such action could potentially result in impairment of the "actuarial soundness" of the TRS, and is completely contrary both to the expression of intent within subsection C of 70 O.S. 2001, § 17-108.2[70-17-108.2] and with the clearly established legal precedent. The financial integrity of the State's employee pension systems may not be unreasonably impaired. Taylor v. State Educ. Employees Group Ins.Program, 897 P.2d 275, 280 (Okla 1995).
Acts of the Legislature are presumed valid. Therefore, we reject this interpretation as inconsistent with the principles of statutory construction. "This court will not assume that the Legislature has done a vain and useless act. Rather it must interpret legislation so as to give effect to every word and sentence." Hill v. Bd. of Educ., 944 P.2d 930, 933
(Okla. 1997). "Statutes must be read in a manner *Page 8 
which effectuates rather than frustrates their purpose." Lincoln v.Lincoln, 840 P.2d 41, 43 (Okla. Civ. App. 1992).
We are left then with the situation at hand. The Legislature, in a tight budget year, bestowed discretion on SBE for allocating the appropriated funds among programs, some statutorily mandated and some not. "Executive discretion is not unfettered. Agencies or departments with statutory requirements, substantive or procedural, pertaining to the selection of their funding recipients obviously are bound thereby. The same is true of any applicable agency rules, regulations, or other administrative procedures pertaining to the selection and funding of otherwise lawful agency programs." A.G. Opin. 87-100, at 192.
It is, therefore, the official Opinion of the Attorney Generalthat:
 1. The State Board of Education and the State Board of Career and Technology Education have a statutory obligation under 70 O.S. 2001, § 17-108.2[70-17-108.2], to transfer appropriated money every year, as prescribed by subsection A of this Section to the Teachers' Retirement System for the funding of the Contributions Credit. McNeill v. City of Tulsa, 953 P.2d 329, 332 (Okla. 1998)
 2. The State Board of Education and State Board of Career and Technology Education have a statutory obligation to transfer appropriated money every year to fund the Contributions Credit from the sums appropriated, regardless of whether the Legislature provides a line item directing such allocation or whether it defers such discretion to the State Board of Education. Menefee v. Askew, 107 P. 159, 162 (Okla. 1910). Whether the State Board of Education abused its discretion is a matter of proof, dependent upon matters of fact which cannot be determined in an Attorney General's Opinion. 74 O.S. 2001, § 18b[ 74-18b](A)(5).
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
REGINA SWITZER ASSISTANT ATTORNEY GENERAL
[1] According to the staff at TRS, Career Tech pays approximately $1 million per year for the Credit in two annual payments from appropriated monies.
[2] Sections 1 through 10, and 139 all provide appropriations to the State Board of Education from the various revenue streams and for the various budget categories. See 2010 Okla. Sess. Laws ch. 427. The funds appropriated in Section 7 are, and historically have been, allocated to various programs including the flexible benefit allowance, for both certified and support personnel health benefits, several matching programs, staff development, and the Teachers Retirement credit. See id.
[3] See Minutes of the Special Meeting of the State Bd. of Educ., FY2011 Common Educ. Budget Work Program Approved p. 3 (Jun. 29, 2010) (on file with the State Bd. of Educ.).
[4] According to the Minutes of the Meeting of the SBE on July 27, 2010, the State Superintendent of Public Instruction announced, "This year the Legislature chose not to include line items therefore these legislative statutes were not funded. At this point it is back on the Legislature which is the state." Id. at 13. Board member Gilpin likewise indicated, "The Legislature abdicated its role this year and did not give the Board of Education enough money to fund the teacher retirement credit." Id.
[5] Record of Career Tech payments since enacted were verified and attested to by the TRS staff.
[6] See Minutes of the Meeting of the State Bd. of Educ., Amend the FY2011 Budget, p. 13 (July. 27, 2010) (on file with the State Bd. of Educ.).
[7] Seen.6, at p. 14.
[8] In addition to earnings, TRS is funded from member, employer, and federal match contribution rates, as provided in the TRS statutes. Additionally, the State of Oklahoma apportions various dedicated tax revenues and a percentage of lottery revenues, all as prescribed by statute.
[9] As discussed in Attorney General Opinion 05-40, Article XXIII, Section 12 of the Oklahoma Constitution provides that "[a]ll the proceeds, assets and income of any public retirement system administered by an agency of the State of Oklahoma shall be held, invested, or disbursed as provided for by law in trust for the exclusive purpose of providing for benefits, refunds, investment management, and administrative expenses of the individual public retirement system, and shall not be encumbered for or diverted to any other purposes." Id at 219 (quoting OKLA. CONST. art. XXIII, § 12). This provision, when combined with provisions in Oklahoma Constitution Article II, Section 15 and theUnited States Constitution Article I, Section 10, clause 1, prohibiting passage of laws impairing contracts, effectively prohibits the Legislature from borrowing money or diverting funds from a public pension system and using the money for another purpose. *Page 1